J-S21024-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.W.S. | : | No. 1618 MDA 2021 |

Appeal from the Order Entered November 24, 2021,
in the Court of Common Pleas of Centre County,
Civil Division at No(s): 2020-0219.

BEFORE:   DUBOW, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                **FILED AUGUST 02, 2022**

Mental-health Patient, J.W.S., appeals his involuntarily commitment for 20 days of inpatient care. Patient asserts there was insufficient evidence to support his involuntary commitment. We disagree and affirm.

In the fall of 2021, Patient became increasingly aggressive towards his family and made self-destructive statements, such as, "I want to . . . go out with a bang." N.T., 11/19/21, at 9. He also discussed burning down his home and his daughter's home. *See id.* Additionally, Patient began "talking about wanting to procure a gun." *Id.* at 15. Those threats and others prompted Patient's relatives to initiate this involuntary-commitment proceeding, and, on November 19, 2021, county authorities brought Patient to Mount Nittany Medical Center for a mental-health assessment by psychiatrist Erica Marden, M.D.

According to Dr. Marden, Patient has a history of mental illness. He has a long-term, false belief that there are "bugs crawling on his skin and that he

---

[*] Retied Senior Judge assigned to the Superior Court.

has been infected by bugs of some sort." *Id.* at 16. Patient continued to complain of these bugs while at the medical center. Thus, he suffers from an "unspecified psychosis, with a provisional diagnosis of delusional disorder and a provisional diagnosis of late-onset, schizoaffective disorder." *Id.* at 7. Doctors prescribed him various drugs, but Patient was noncompliant. He told the medical-center staff to "shove it," when they offered him medication. *Id.* at 11.

The medical center arranged to transfer Patient to East End Behavioral Health Hospital in Pittsburgh for additional treatment that would improve his condition. East End offered an inpatient, psychiatric setting, where they could adjust his medications. "There would also be family meetings, and he would attend group, once he [could] tolerate those." *Id.* at 13. When Dr. Marden presented this plan of treatment to Patient, he opposed it. Therefore, the medical center petitioned the Court of Common Pleas of Centre County to commit him to East End for 20 days. The county's review officer convened a hearing to consider the involuntary-commitment petition.

Dr. Marden testified in support of involuntary commitment and related the above facts. Furthermore, due to the threats Patient made, his history of mental illnesses, and his refusal of medical treatment, Dr. Marden opined that Patient was incapable of seeing to his medical health and safety. *See id.* at 8. She believed continued treatment was needed to protect Patient from himself and others. Left untreated, Patient's behavior would "potentially" lead to death, disability, or serious physical debilitation within 30 days. *Id.* at 10.

When asked on cross-examination what she meant by "potentially," Dr. Marden said she was "still very concerned about his acute risk, given that he has been making these statements to family before coming in, has been very threatening towards them, and has been quite irritable with staff here." *Id.* at 18. Moreover, he "has not been taking any medication to reduce the likelihood of those same behaviors occurring, if he would return [home]." *Id.* at 19.

Based upon Dr. Marden's expert testimony, the mental-health-review officer granted the petition for 20 days of involuntary commitment at East End. Patient filed a petition for judicial review of that decision, which the trial court denied. This timely appeal followed.

Patient raises one claim of error on appeal: whether the medical center presented "sufficient evidence to commit [Patient] to involuntary psychiatric treatment, as it failed to present clear and convincing evidence of conduct supporting a reasonable probability that death, serious debilitation, or bodily injury was likely imminent?" Patient's Brief at 5.

In Patient's view, the Mental Health Procedures Act ("MHPA"), 50 P.S. §§ 7101-7503, demands evidence that he acted on his threats before the review officer could order his involuntarily commitment. He contends, while there was proof "he was irritable, the [MHPA] requires more to deprive a citizen of his liberty and right to decline medication." Patient's Brief at 10.

In an appeal regarding an involuntary commitment, "this Court is not to find facts but to determine whether there is evidence in the record to justify

the hearing court's findings."[1]  ***Commonwealth ex rel. Gibson v. DiGiacinto***, 439 A.2d 105, 107 (Pa. 1981).  Our standard of review of legal conclusions is *de novo*.  ***See id.***  A "challenge to the sufficiency of the evidence presents a pure question of law, requiring review of the facts of record in the light most favorable to the original decision-maker . . . to determine whether the requisite standard of proof has been met."  ***In re Vencil***, 152 A.3d 235, 243 (Pa. 2017).  In this case, the original decision-maker was the review officer.

Under the MHPA, after an initial assessment, if a mental-health "facility determines that the need for emergency treatment is likely to extend beyond 120 hours," the facility must petition a court of common pleas for permission to continue the involuntary commitment.  50 P.S. § 7303(a).  There is a hearing on the petition.  If "the judge or the review officer finds that the person is severely mentally disabled and in need of continued involuntary treatment, either as an inpatient or through less restrictive assisted outpatient treatment, he shall so certify."  50 P.S. § 7303(c).  "Otherwise, [the court] shall direct that the facility director or his designee discharge the person."  ***Id.***  Thus, we must determine whether there was sufficient evidence that Patient was "severally mentally disabled," under subsection 7303(c) of the MHPA.

---

[1] Thus, while Patient also testified, the mental-health-review officer deemed his testimony incredible or gave it little to no weight.  Thus, we may not consider Patient's version of events within our scope of review to the extent that it contradicts Dr. Marden's testimony.

"An individual is severely mentally disabled if, as a result of mental illness, his capacity . . . to care for his own personal needs is so lessened that he poses a clear and present danger of harm . . . to himself." *Vencil*, 152 A.3d at 237 (quoting 50 P.S. § 7301(a)) (quotation marks omitted).

An individual is a "clear and present danger" to himself when, within the past 30 days, he:

> has acted in such manner as to evidence that he would be unable, without care, supervision, and the continued assistance of others, to satisfy his need for . . . medical care, . . . or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury, or serious physical debilitation would ensue within 30 days, unless adequate treatment were afforded . . . .

50 P.S. § 7301(b)(2)(i). This Court has previously held that, when subsection 7301(b)(2)(i) applies, "no demonstration of an overt act is necessary to involuntarily commit the individual under Section 303 of the [MHPA]." *In re S.B.*, 777 A.2d 454, 459 (Pa. Super. Ct. 2000).

There, S.B. made statements to healthcare providers indicating she "was not clear on whether she could be safe . . . or whether she was suicidal . . . ." *Id.* at 458. She refused to take depression and anxiety medication, refused to eat, and had poor hygiene. Finally, S.B. could not "'contract for safety', a procedure by which a patient agrees to approach the staff for help if she feels suicidal." *Id.* Based on the above, this Court affirmed her involuntary commitment under 50 P.S. § 7301(b)(2)(i).

According to Patient, *In re S.B.* is distinguishable on the grounds that S.B. made statements of "suicidal ideation" but he did not. Patient's Brief at 15. He further contends that S.B. was less capable of caring for herself than he was, because of her "refusal of medication which might alleviate [her suicidal] deliberations, refusal to eat, and poor hygiene." *Id.* In making his claim, Patient contends that he "displayed no indication of lack of ability for nourishment, personal or medical care, shelter, or self-protection and safety . . . ." *Id.* at 15-16.

This contention fails, however, because the review officer credited Dr. Marden's testimony, rather than Patient's version of events. *See Vencil*, *supra*.

First, based on the doctor's testimony, Patient went beyond the mere "suicidal ideations" that S.B. entertained. Envisioning self-slaughter, Patient wanted to "go out with a bang" and wanted to burn down his home. N.T., 11/19/21, at 9. Such statements reasonably indicate that Patient potentially planned to take his own life in dramatic fashion: an arson/suicide. Therefore, the record supports the factual finding that Patient, at a minimum, contemplated suicide.

Second, Dr. Marden opined that, because Patient refused to take his antipsychotic medication, Patient's mental illnesses inhibited his ability to care for his medical health and safety. He was "unable, without care, supervision, and the continued assistance of others, to satisfy his need for . . . medical care . . . or self-protection and safety . . . ." 50 P.S. § 7301(b)(2)(i). That

testimony sufficiently establishes that Patient was a clear and present danger to himself, because the subsection uses the word "or" when listing the life functions at issue.

The legislature's use of the disjunctive indicates that a treatment facility need only prove that a mentally ill individual is incapable of providing for **one** life function to secure an involuntary commitment. Thus, the fact that Patient could feed, clothe, and shelter himself was irrelevant, given his inability to provide for his medical health and safety. If subsection 7301(b)(2)(i) used the conjunction "and" when enumerating the life functions, then the test would be whether an individual could not provide for any of his life functions. But that is not the law. Patient's inability to provide for just one basic life functions renders him a clear and present danger to himself under statute.

Hence, we agree with the trial court; **S.B.** controls. An overt act is not required for Patient's involuntary commitment, because the legislature has sanctioned his commitment without evidence of such an act under 50 P.S. § 7301(b)(2)(i). That subsection applies.

Dr. Marden's testimony establishes, by clear and convincing evidence, that Patient would not be able to provide for his medical health and safety, because he refused the medication needed to combat his psychoses. She based her opinion upon statements Patient made to his family and healthcare providers and his refusal of medication within the past 30 days. Furthermore, she opined, within a reasonable degree of medical certainty, that Patient had

a potential of harming himself within the next 30 days, if not treated at East End Hospital.

Therefore, like the review officer and the trial court, we conclude that Dr. Marden's testimony, when considered in the light most favorable to the review officer's decision, establishes that, "as a result of mental illness, [Patient's] capacity . . . to care for his own personal needs is so lessened that he poses a clear and present danger of harm . . . to himself."  50 P.S. § 7301(a).  Patient is not entitled to appellate relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/02/2022